## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

Mehdi Saharkhiz,

<em>Plaintiff,</em>

vs.

**Case Number:  1:19-cv-02938-TFH**

The Islamic Republic of Iran et al.;

<em>Defendants.</em>

## PLAINTIFF'S BRIEF IN OPOSITION TO AMICUS BRIEF

### Introduction and Background

This Brief responds to the amicus curiae brief of the Farashgard Foundation ("Amicus Brief") in opposition to Plaintiff's request for default judgment in the above-captioned matter. Clear and binding precedent pursuant to 28 U.S.C. § 1605A holds that a U.S. national may sue a state sponsor of terrorism for the hostage taking and torture of their foreign national parent, from which the plaintiff suffered, as long as the defendant was a state sponsor of terrorism and the plaintiff a U.S. national at the time the alleged conduct occurred. The arguments raised in the Amicus Brief seek for this Court to issue a ruling that would repudiate this binding precedent. This Brief will specifically respond to the following claims put forth in the Amicus Brief:

> (1) Section 1605(A) of the FSIA should not apply equally to plaintiffs of different personal character and political beliefs, and, therefore, the alleged and speculative character of Plaintiff and Plaintiff's father should preclude Plaintiff from recovery in this case;
> (2) Plaintiff is not entitled to recover damages for violations prior to May 24, 2011; and
> (3) The Act-of-State Doctrine precludes this Court from hearing Plaintiff's claims or awarding Plaintiff damages.

**I. Plaintiff should not be precluded from recovering damages in this case due to the Amicus's speculations as to the character and political beliefs of Plaintiff and his father.**

In their Amicus Brief, the Farashgard Foundation introduces itself as a staunch supporter of human rights and an opponent of fundamentalist Islamic regimes following the 1979 revolution. It continues with allegations of Mr. Isa Saharkhiz's role in those regimes as "one of the nation's chief censors" and accuses Plaintiff of "disingenuously attempt[ing] to mislead this Court by obfuscating the truth" and supporting those regimes. The Foundation asserts that as a supporter of human rights, it advises that the Court may not hear Plaintiff's claims due to his and his father's alleged character and beliefs. Amicus Brief, p. 1-4. While Plaintiff appreciates the Foundation's commitment to the "Iranian people's fundamental right to liberty and democracy", the law does not entitle this Court to pick and choose which humans deserve these rights, especially not (1) based on speculative claims as to an individual's character and beliefs, (2) absent such a distinction in the applicable law, and (3) while binding precedent requires otherwise.

First, the Foundation mischaracterizes Mr. Isa Saharkhiz's and Plaintiff's character and beliefs, which is irrelevant to the legal issues and facts of this case, highly inappropriate without substantial and corroborating evidence, and uncharacteristic of a human rights organization against someone they have conceded was a victim of human rights abuses, acknowledging that the acts against Mr. Isa Saharkhiz were "despicable, evil acts". *Id*., at 12.

The Foundation accuses Mr. Isa Saharkhiz of being "one of the nation's chief censors" and accuses Plaintiff of "disingenuously attempt[ing] to mislead this Court by obfuscating the truth, vaguely alluding in passing to Isa Saharkhiz's 'position at the IRNA' (without even explaining that abbreviation)" and supporting previous regimes. *Id*., at 1-4. These assertions are patently false. In Plaintiff's Motion for Default Judgment ["DJ Motion"], Plaintiff explains that his father held

"various government positions", including "as a reporter with the Iranian News Agency ("IRNA"), Iran's official news agency", and "closely aligned himself with the opposition reformist government while continuing to push for broader access to journalism". Plaintiff's Motion for Default Judgment ["DJ Motion"], p. 2. While the Foundation might have political disagreements with former government regimes in which Mr. Isa Saharkhiz worked, he was not a mere agent of the government but an individual dedicated to enhancing freedoms throughout his country. As a government employee, Plaintiff explains that his father also led the Media Department in the Iranian Ministry of Culture and Islamic Guidance in 1997, pioneering the country's least restrictive period of media activity in Iran since the Revolution, helped to establish laws that prevented arbitrary state encroachment on journalism, and helped found the first newspaper in Iran dedicated almost exclusively to women. DJ Motion, p. 2. He used his time and roles in the government to improve the human rights condition in Iran, which the Foundation concedes as it states that Mr. Isa Saharkhiz was pressured to resign from Defendant Ayatollah Khamenei's regime due to his support for a magazine concerning women's rights. Amicus Brief, p. 3.

In the absence of evidence to support their claim that Mr. Isa Saharkhiz was "one of the nation's chief censors", the Foundation accuses Plaintiff himself of being an activist of the former regime of President Rouhani, based solely on select social media posts of Plaintiff's. *Id.*, at 3-4. Regardless, Plaintiff's and his father's character and beliefs, speculative or not, may not limit the applicability of Section 1605A of the FSIA or Plaintiff's entitlement to statutory relief.

Second, the Foundation misstates the law of Section 1605A, inaccurately concluding that Plaintiff's claims are not "standard" claims under this exception. The Foundation asserts that Mr. Isa Saharkhiz's alleged feud with Defendant Khamenei's regime over his feminist beliefs was "an internal power struggle among partisan factions to determine who will control the repressive

regime for [Iran]" and that this "does not present a standard 1605A scenario involving terrorist bombings", "brutal or indiscriminate murders", "targeted assassinations", or "airplane hijackings" *Id*. Aside from the Foundation putting forth a false and baseless assertion that Plaintiff's father was in pursuit of control over an Iranian regime, Section 1605A does not require Plaintiff to claim the occurrence of a terrorist bombing, brutal or indiscriminate murder, targeted assassination, or airplane hijacking. The Foundation has excluded other enumerated causes of action that plaintiffs may bring under Section 1605A, which are the same causes of action that Plaintiff brings in this case – hostage taking and torture. Plaintiff's claims are "standard" and expressly enumerated, irrespective of the nature of his father's fractured relationship with the regime that targeted him.

Third, this Court has granted damages in Section 1605A cases to loved ones of "high-ranking officials of states sponsors of terrorism", including *Oveissi* and *Bayani*, a high-ranking general and a military officer respectively. *Oveissi v. Islamic Rep. of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012).*; Bayani v Islamic Rep. of Iran*, Civil Action 04-017012 (HHK) (D.D.C. 2017).

## II. Plaintiff may recover damages for injuries he suffered before becoming a U.S. national.

The Foundation argues in their Amicus Brief that Plaintiff cannot receive damages for injuries he suffered from Defendants' hostage taking and torture of his father prior to him becoming a U.S. national on May 24, 2011, relying on the *Mohammadi* case in which the plaintiffs were not U.S. nationals during any of the alleged injuries. Amicus Brief, p. 9-10. However, the Court may grant damages to Plaintiff for injuries he suffered before becoming a U.S. national for two reasons. First, the language of the FSIA does not place a temporal limitation on the recoverable damages period. Second, the continuous tort doctrine entitles Plaintiff to damages for the entire period during which he suffered injuries from Defendants' continuous hostage taking and torture of his father.

### 1. <u>Language of the FSIA</u>

The FSIA's terrorism exception, 28 U.S.C. § 1605A, references a claimant's nationality in two subsections relevant here: (1) subsection 1605A(a)(2)(A)(ii)(I) concerning the court's subject matter jurisdiction to hear a claim under this section, and (2) subsection 1605A(c)(1) concerning the private right of action requirements. In the former subsection, the statute states that "[t]he court shall hear a claim under this section if", in relevant part, the claimant or the victim was a U.S. national at the time the relevant act occurred. 28 U.S.C. § 1605A(a)(2)(A)(ii)(I). This requirement must be met in order for the court to hear a plaintiff's claim. In the latter subsection, the statute discusses a nationality requirement in the context of damages, stating:

> "A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—
> (1) a national of the United States". 28 U.S.C. § 1605A(c)(1).

Here, the statute does not provide any explicit or implicit requirement that limits the period for the calculation of damages. Instead, the statute places a temporal limitation only on the requirement regarding the court's ability to hear a plaintiff's claim; once the court finds that a claim may be heard by satisfying each element under § 1605A, then there is a private cause of action for a U.S. national plaintiff to bring an action and recover damages for the enumerated acts. This allows for a scenario in which the Court finds Plaintiff has standing pursuant to § 1605A(c) to bring an action against Defendants for hostage taking and torture that occurred while he was a U.S. national, and does not limit the recoverable damages to the statutory period in which Plaintiff had standing. Thus, Plaintiff may recover damages for the continuous acts of hostage taking and torture, which began prior to him becoming a U.S. national and continued during and after, even though he was not a U.S. national when the acts initiated. The Court should hold Defendants liable to Plaintiff for the totality of the harm he endured due to Defendants' continuous acts. Neither the black letter law of Section 1605A nor precedential case law suggests or demands otherwise.

Mr. Isa Saharkhiz was a hostage of and tortured by Defendants from July 2009 to October 2013 and again from November 2015 to June 2017. DJ Motion, p. 13. During this time, Plaintiff became a U.S. national on May 24, 2011. Plaintiff's Naturalization Certificate, Ex. 2. These dates represent when Plaintiff first had standing to file suit under the FSIA, not a delineation for which fraction of suffering he is entitled to receive damages.

Further, Plaintiff has brought claims to recover for solatium and economic damages. Plaintiff requests economic damages solely for the economic harm he endured while a U.S. national, and solatium damages for the entirety of the harm he endured relating to the continuous acts of his father's hostage taking and torture. DJ Motion, p. 30-4.

## 2. __Continuing Tort Doctrine__

Claims under Section 1605A(c) are governed by tort law. One tort principle instructive here is the "continuing tort" doctrine. The doctrine states that "[w]here a continuing tort causes a single, indivisible injury, the cause of action accrues at, and limitations begin to run from, the time when the nature and extent of the damage are ascertainable, which may be at the inception of the tort or not until the last date of the tortious conduct." 54 C.J.S. Limitation of Actions § 204 (2005). Under District of Columbia law, this Court has found that the doctrine requires a plaintiff to allege:

> "(1) a continuous and repetitious wrong, (2) with damages flowing from the act as a whole rather than from each individual act, and (3) at least one injurious act within the limitation period." *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 729 (D.C.C. 2008) (quoting *Beard v. Edmondson Gallagher*, 790 A.2d 541, 547-48 (D.C. 2002)).

The spirit of this doctrine is to ensure that, where a continuing tort has a cumulative effect, "such that the injury might not have come about but for the entire course of conduct …, then all damages caused by the tortious conduct are recoverable even though some of the conduct occurred outside the limitations period." *Beard*, supra, at 548. While the statute of limitations is not at issue here, the principle of indivisible pain and suffering from continuous torts supports the conclusion

that Plaintiff is entitled to all damages for his pain and suffering caused by Defendants' tortious acts against his father including that which he suffered prior to becoming a U.S. national.

In *National Telephone Coop. Assn. v. Exxon Corp.,* this Court heard the 1998 case involving a telephone company and a gasoline distributor with adjacent properties. The telephone company alleged that the gasoline distributor was liable for gasoline contamination that migrated from the gasoline distributor's underground storage tanks and onto the telephone company's property, damaging its resale value. The telephone company reported these leaks first in 1990, and again beginning in 1995. *National Tel. Coop. Ass'n v. Exxon Corp.*, 38 F. Supp 2d 1, 1-4 (1998). In response to the gasoline distributor's claim that the complaint was time-barred due to an applicable statute of limitations of five years, this Court applied the above definition of the continuous tort doctrine, finding in favor of the telephone company. Specifically, this Court found that a continuous tort was present, and the complaint was timely, because: (1) the gasoline leaks were continuous and repetitive; (2) damages, namely to resale value, flowed from the act as a whole rather than from each individual leak; and (3) at least one injurious act, or leak, occurred within the limitation period. Therefore, the telephone company may be able to recover for the entire course of conduct, including the leaks that occurred prior to the limitation period. *Id*., at 7-11.

Many courts have since recognized and applied this principle, finding that prescriptive periods such as statues of limitations do not define the period for which damages can be recovered. *See Lehman v. Lucom,* 727 F.3d 1326 (11th Cir. 2013); *Rockwell Int'l Corp v. Wilhite*, 143 S.W.3d 604 (Ky.App. 2003); and *Montrose Chemical Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645 (1995). Courts have routinely applied the continuous tort doctrine to findings of torture and intentional infliction of emotional distress in various contexts, including cases concerning denying prisoners medical care and hostage taking. *See, e.g., Hernandez v. Arpaio*, 2018 U.S. Dist. LEXIS 229759

(D. Ariz. 2018); *Lucero-Nelson v. Washington Metro. Area Transit Auth*., 1 F. Supp. 2d 1 (D.D.C. 1998); *Von Dardel v. Union of Soviet Socialist Republics*, 623 F. Supp. 246, 246-50 (D.D.C. 1985); and *Page v. United States,* 729 F.2d 818, 821 (D.C.C. 1984).

Here, Defendants' acts against Mr. Isa Saharkhiz also constitute continuous torts, satisfying this Court's three-pronged test. First, Defendants' wrongful acts were continuous and repetitious, as Mr. Isa Saharkhiz was unceasingly held hostage and tortured by Defendants from July 2009 to October 2013 and again from November 2015 to June 2017. DJ Motion, p. 13-26. Second, damages flow from Defendants' act as a whole rather than from each individual act. While numerous acts committed by Defendants against Mr. Isa Saharkhiz constitute discrete acts of hostage taking and torture, Plaintiff's Motion for Default Judgment demonstrates the likelihood that his father's ultimate pain and suffering was a result of continuing violations having a cumulative effect, such that his resulting injuries such as his severe heart and kidney conditions might not have come about but for the entire course of conduct against him. *Id*., at 20-3. Further, Plaintiff's resulting suffering during these six years have cumulatively and permanently injured him. *Id*., at 30-2. Third, at least one injurious act occurred within the period during which Plaintiff was a U.S. national. Mr. Isa Saharkhiz was a hostage of and tortured by Defendants from July 2009 until October 2013, and again from November 2015 until June 2017. As Plaintiff became a U.S. national on May 24, 2011, Plaintiff was a U.S. national for more than half of this first period and for the totality of the second. Given the continuous and related nature of the violations against Mr. Isa Saharkhiz, "all damages caused by the tortious conduct are recoverable even though some of the conduct occurred outside the limitations period," or the period in which Plaintiff was a U.S. national. *Beard*, supra, at 548.

**III. The Act-of-State Doctrine does not preclude this Court from hearing Plaintiff's claims or awarding Plaintiff damages.**

1. <u>History of the Act-of-State Doctrine</u>

In the Amicus Brief, the Farashgard Foundation asserts that the Act-of State Doctrine bars Plaintiff's claims in this case in so far as they ask the Court to "assess the validity of Iranian law or an Iranian conviction." Amicus Brief, p. 23**.** However, the Foundation fails to discuss how U.S. courts have modified the application of the Act-of-State Doctrine through binding precedent, particularly in the context of violations of principles of international law.

The Act-of-State Doctrine ("Doctrine") is a common law principle which prevents U.S. courts from determining the validity of the official and public acts of a foreign state. This Doctrine is not an international law or norm, but a principle recognized in U.S. courts. While the Doctrine was first clearly articulated and established in the 1897 case of *Underhill v. Hernandez,* U.S. courts have restricted the breadth of the Doctrine many times since then.

The earliest restrictions to the Doctrine are found in the U.S. Supreme Court's 1963 holding in *Banco Nacional de Cuba* v. *Sabbatino* and the 1964 Second Hickenlooper Amendment to the Doctrine a few months later. In *Sabbatino*, the U.S. Supreme Court held that U.S. courts:

> "will not examine the validity of a taking of property within its own territory by a foreign sovereign […] in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law." *Banco Nac'l de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964).

Months later, the U.S. Congress responded to this holding with the Second Hickenlooper Amendment, which prohibits U.S. courts from applying the Doctrine in cases involving expropriation by a foreign state that may be "in violation of the principles of international law." 22 U.S.C. § 2370. This Amendment narrowed the scope of the Doctrine "to certain claims of expropriation." *McKesson Corp. v. Islamic Rep. of Iran*, 672 F.3d 1066, 1078 (D.C. Cir. 2012).

In 2007, the 1964 Amendment was expressly expanded beyond the context of expropriations, in turn further limiting the application of the Doctrine, by the 9th Circuit in *Sarei*

*v. Rio Tinto*. In *Sarei*, the 9th Circuit reversed the dismissal of Papua New Guinea residents' claims of human rights violations under both customary international law and the Alien Tort Claim Act, holding that *jus cogens* norms precluded the application of the Doctrine because "violations of *jus cogens* norms are not sovereign acts." *Sarei v. Rio Tinto*, 671 F.3d 736, 742, 759 (9th Cir. 2011).

2. <u>The Foundation's Mischaracterization of the Act-of-State Doctrine and its Application to the FSIA</u>

In their Amicus Brief, the Foundation mischaracterizes the Doctrine's application, its relationship with the FSIA, and U.S. nationals' rights under the FSIA. First, the Foundation misstates the Doctrine's application to cases concerning violations of international law, namely *jus cogens* norms, and what makes an issue "domestic". It claims that, based on the Doctrine, U.S. courts may not allow "foreign nationals with no connection to this nation" to "obtai[n] relief" for domestic issues with no connection to the U.S. Amicus Brief, p. 1. While true, the Foundation fails to acknowledge that the FSIA's terrorism exception, or Section 1605A, underwrites this condition; this condition is an example of how the FSIA does not nullify the Doctrine, but reasonably limits it. The 1976 terrorism exception identifies limited, enumerated violations that amount to international crimes beyond mere domestic concern, including hostage taking and torture, and prevents them from affecting U.S. citizens by enabling U.S. nationals to sue foreign states for these enumerated causes of action. A plaintiff's U.S. nationality is a sufficient connection to the U.S. as long as the cause of action is of sufficiently international character and concern.

Here, the Foundation asserts that the Doctrine "precludes this court from sitting in judgment of the actions of the Iranian legal system, much less designating its ordinary operation—however loathsome—to be acts of terrorism under sec. 1605A. Plaintiff cannot use either the FSIA's private cause of action or tort law to collaterally attack the convictions of his father, an

Iranian citizen, for violations Iranian law based on acts performed in Iranian territory". *Id.*, at 21. However, this case concerns enumerated Section 1605A causes of actions of hostage taking and torture, which are acts "in violation of the principles of international law" and *jus cogens* norms.[1] Plaintiff is not asking this Court to sit in judgment of actions of the Iranian legal system that are merely of domestic concern, but of international concern against a U.S. national, as Plaintiff has endured severe pain and suffering as a result of Defendant Iran's acts against his father.

Second, the Foundation further disregarded that the Doctrine is intended to apply to claims of expropriation, not terrorism and torture violations. As case law to which the Foundation cited demonstrates, the Doctrine is primarily invoked in the context of commercial activities that do not concern terrorism, torture, human rights or *jus cogens* violations; it is precluded in cases brought under Section 1605A because this exception concerns claims that by definition involve acts "in violation of the principles of international law" and *jus cogens* norms, including hostage taking and torture. The peer-reviewed Oxford Bibliographies definition of the Doctrine explicitly states that it applies "except if [the foreign state] commits violations of international norms with broad consensus of international society".[2] For this reason, this Court primarily invokes the Doctrine in cases under the FSIA's commercial activity exception relating to property issues. 28 U.S.C. §1605(a)(3).

Even so, the Foundation misguidedly argues that the Doctrine extends to all FSIA cases by relying on this Circuit's holdings in cases brought under the FSIA's commercial activity exception, such as *McKesson* and *Philipp*, not the FSIA's terrorism exception. While the Foundation asserts

---

[1] U.N. Human Rights Committee, General Comment No. 24, para. 10, U.N. Doc. CCPR/C/21/Rev.1/Add.6 (2001); U.N. Human Rights Committee, General Comment No. 29, para. 11, U.N. Doc. CCPR/C/21/Rev.1/Add.11 (2001).
[2] Alfonso Iglesias, Act of State Doctrine, Oxford Bibliographies (April 2020), www.oxfordbibliographies.com/view/document/obo-9780199796953/obo-9780199796953-0207.xml?rskey=3V1bzQ&result=1.

that in the 2012 case of *McKesson* this Court held that the Doctrine "preclude[s] challenges to actions that, by their nature, could only be undertaken by a sovereign power", the Court in *McKesson* actually referenced this 1964 quote from *Sabbatino* and went on to hold that the case before it "differ[s] dramatically from prior cases in which the act of state doctrine applied." *McKesson*, supra, at 1073-74. This Court reasoned that in *McKesson*, under the commercial activity exception concerning Iran's alleged expropriation of the plaintiff's interest in an Iranian dairy and withholding of their dividends, the "facts allege a pattern of conduct by Iran's agents that cannot fairly be characterized as public or official acts of a sovereign government" but of a government abusing its position as a majority shareholder. *Id.*, at 1074. The Court ultimately found that the Hickenlooper Amendment narrowed the scope of the Doctrine "to certain claims of expropriation" that involve a sovereign government's public or official acts. *Id.*, at 1078.

Further, the Foundation relies on the 2018 case of *Philipp* to assert that the "FSIA does not abolish the act of state doctrine, particularly for claims that fall outside § 1605A(c)'s private right of action." Amicus Brief, p. 22. While Plaintiff does not contest this, the Foundation ignores the relevant holding. The *Philipp* case was originally brought by heirs of German Jewish art dealers who alleged that the Nazi German government unlawfully coerced them into selling their medieval relics to Prussia for a third of its value. In 2021, the U.S. Supreme Court held that the FSIA's commercial activity exception incorporates only the international law of property, not human rights law. The Supreme Court found that the property taking was purely domestic and, due to its non-international character, the Doctrine precluded the issue from being heard. *Federal Rep. of Germany v. Philipp*, 141 S.Ct. 703, 705-707, 714 (2021).

Third, the Foundation misstates the jurisdiction requirements relating to a plaintiff's standing to bring a claim pursuant to 28 U.S.C. § 1605A(a)(2)(A)(ii)(I) and the Doctrine's

application to them. The terrorism exception requires a connection to the U.S. through the plaintiff's nationality and that the foreign state was a state sponsor of terrorism, both at the time of the alleged conduct; these conditions ensure that the foreign state is being sued for their violations of human rights and *jus cogens* norms that caused a U.S. national severe pain and suffering. Through this exception, Congress proclaims that as long as the plaintiff – who brings a cause of action for a violation of a human right or *jus cogens* norm beyond domestic concern pursuant to the exception – is a U.S. national, there is a sufficient connection between a foreign "domestic issue" and the U.S. for the plaintiff to obtain relief under the exception.

While the Foundation concedes that this Court has "expressed great skepticism about applying the act-of-state doctrine to suits brought under the FSIA's state-sponsored terrorism exception", citing *Owens* and *Daliberti*, it claims that these cases represent the exception, where U.S. nationals were direct victims therefore not constituting this Court "sitting in judgment of Iran's laws and court judgments as applied to an Iranian citizen within Iranian territory." Amicus Brief, p. 23. However, as in *Owens* and *Daliberti*, this Court has held that the Doctrine does not bar Section 1605A claims concerning acts directly against non-U.S. nationals as long as the plaintiffs were U.S. nationals at the time the acts occurred. *Owens v. Rep. of Sudan*, 374 F. Supp. 2d 1, 26-27 (D.D.C. 2005); *Daliberti v. Rep. of Iraq*, 97 F. Supp. 2d 38, 40-1 (D.D.C. 2000). In *Han Kim*, the D.C. Circuit found that South Korean national Reverend Kim was taken hostage and tortured by the North Korean government. This Circuit found that the plaintiffs could bring the case against North Korea even though Reverend Kim, their father and brother, was not a U.S. national because one Plaintiff was a U.S. national and the other was "[a]n individual deemed to owe a permanent allegiance to the United States and who actively pursues U.S. citizenship can be held to be a 'national of the United States' in satisfaction of § 1605A(a)(2)(A)(ii)(I)" at the time

of the acts. *Han Kim v. Dem. People's Rep. of Korea*, 950 F. Supp. 2d 29, 37, 41-2 (D.C.C. 2013). Similarly in *Oveissi*, this Court found the American grandson of Iranian General Gholam Ali Oveissi, who was extrajudicially killed by Iran, had standing to sue Iran. *Oveissi*, supra, at 52.

Here, Plaintiff brings claims concerning the hostage taking and torture of his Iranian father under Section 1605A of the FSIA against a state sponsor of terrorism for his resulting severe pain and suffering, and was a U.S. national when the majority of these acts occurred. Therefore, as in *Owens*, *Daliberti*, *Han Kim*, and *Oveissi*, the Doctrine does not preclude Plaintiff's claims.

Fourth, the Foundation fails to acknowledge that even if the Doctrine did apply to matters concerning violations of *jus cogens* norms, its application would still be precluded in this case due to the purpose of the Doctrine. Specifically, the Foundation ignores a principle this Court and other federal courts have held in cases it cited, including *Kashef* and *Beatty*:

> "The Supreme Court has made clear that the act of state doctrine has important boundaries. It is not a categorical rule of abstention that prohibits courts from deciding cases or controversies whenever issues of foreign relations arise. […] "The Supreme Court has determined that when the validity of a foreign state's action is not the question being litigated, and the inquiry is simply whether the conduct in question occurred, the act of state doctrine is not implicated. *Kirkpatrick*, 493 U.S. at 409, 110 S. Ct. 701." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 59-60 (2d Cir. 2019).

In *Kashef*, the U.S. Court of Appeals for the 2nd Circuit heard the non-FSIA case brought victims against a bank for allegedly aiding and abetting atrocities carried out by the Sudanese government. The 2nd Circuit found that the Doctrine was not implicated because no party nor the international community asserted that the alleged atrocities were "valid", or lawful. The inquiry was into the occurrence of the atrocities, not their validity. *Id*., at 61. Similarly here, the Doctrine is not implicated because the issue is not whether the acts of hostage taking and torture against Mr.

Isa Saharkhiz were valid – as these are *jus cogens* crimes and even criminalized by Iranian law[3] – but whether these acts, and Plaintiff's resulting pain and suffering, occurred.

In *Beatty*, this Court heard the case of two victims of hostage taking and torture by the Iraqi government. While the Court acknowledged that a foreign government's detention and imprisonment of individuals within its own territory provides "the factual predicate for application of the act of state doctrine", it held that, as in *Owens* and *Daliberti*, the purpose of the Doctrine would not be furthered by its application in the case. This Court recognized that in *Owens* and *Daliberti*, the Court precluded the application of the Doctrine because:

> "[…] the political branches enacted a statute whose text and structure expressly contemplate holding a foreign state liable for terrorist acts committed years earlier, and that this statute does not come into play unless the Executive Branch had identified a nation as a sponsor of terrorism at the time of the acts at issue. […] Under such circumstances, it is difficult if not impossible to say that the judiciary would be unduly interfering with the political branches' conduct of foreign policy, which is the principal concern underlying the act-of-state-doctrine." *Beatty v. Rep. of Iraq*, 480 F. Supp. 2d 60, 89-90 (D.D.C. 2007).

This Court found this justification also applied in *Beatty*, as *Beatty*, *Owens*, and *Daliberti* each raised claims under Section 1605A against a state sponsor of terrorism. *Id*. This justification also applies here, as Plaintiff brings claims of hostage taking and torture under Section 1605A against a state sponsor of terrorism. While the "factual predicate for the application of the act of state doctrine" exists, the Doctrine's purpose would not be furthered by its application in this case. Finally, the wide range of cases under FSIA section 1605A in this District and other Courts, against Islamic Republic of Iran, clearly indicates that the Act-of-State Doctrine does not apply to cases

---

[3] Constitution of the Islamic Republic of Iran, adopted 1979, amended 1989, art. 32 ("In case of arrest, charges with the reasons for accusation must, without delay, be communicated and explained to the accused in writing, and a provisional dossier must be forwarded to the competent judicial authorities within a maximum of twenty-four hours so that the preliminaries to the trial can be completed as swiftly as possible."); and art. 38 ("All forms of torture for the purpose of extracting confession or acquiring information are forbidden. Compulsion of individuals to testify, confess, or take an oath is not permissible; and any testimony, confession, or oath obtained under duress is devoid of value and credence."); *see also* Iranian Criminal Procedure, 1997, art. 119 ("The accused shall be summoned by an arrest warrant. The arrest warrant, which contains the reasons for the summons, must be read to the accused.").

against Islamic Republic of Iran when the requirements under section 1605A, terrorism exceptions, are satisfied.

## Conclusion

For the foregoing reasons, the arguments presented in the Amicus Brief mischaracterize the relevant law and seek for this Court to issue a ruling that would repudiate binding precedent. Therefore, Plaintiff respectfully requests that the Court enters default judgment in his favor pursuant to Plaintiff's pending Motion for Default Judgment.


Respectfully submitted,


_____/s/_____

Ali Herischi, Esq.
MD0024
Herischi & Associates LLC
7201 Wisconsin Ave. Ste. 440
Bethesda, MD 20814
ali.herischi@ibhlaw.com
Tel.: 301.363.4540
Fax: 301.363.4538

*Counsel for Plaintiff*